FILED
United States Court of Appeals
Tenth Circuit

July 20, 2021

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

PHELPS OIL & GAS, LLC, on behalf
of itself and a class of similarly
situated royalty owners,

　　　　Plaintiff-Appellant,

　　v.

NOBLE ENERGY INC.; DCP
MIDSTREAM, LP,

　　　　Defendants-Appellees.

No. 19-1376

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:14-CV-02604-REB-SKC)

---

George A. Barton (Stacy A. Burrows with him on the briefs), Law Offices of
George A. Barton, P.C., Overland Park, Kansas, for Appellant.

Shannon Wells Stevenson (Jonathan W. Rauchway and James R. Henderson with
him on the brief) Davis Graham & Stubbs, LLC, Denver, Colorado, for Appellee
Nobel Energy Inc.

Daniel M. McClure (Matthew A. Dekovich with him on the brief), Norton Rose
Fulbright US LLP, Houston, Texas, for Appellee DCP Midstream LP.

---

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

Phelps Gas & Oil brought a class action in Colorado state court against Noble Energy and DCP Midstream for underpayments on oil and gas royalties Noble allegedly owes Phelps and other owners of royalty interests. DCP Midstream removed the class action to federal district court. Phelps then moved to remand the case to state court, arguing the case failed to meet the federal $75,000 amount-in-controversy requirement. 28 U.S.C. § 1332(a). The district court denied the motion, and later entered summary judgment, dismissing all of Phelps's claims.

We conclude the district court erred in denying Phelps's motion to remand, and we thus dismiss the appeal for lack of jurisdiction. Applying the "either viewpoint" rule, neither the value to Phelps nor the cost to either defendant in this case would result in more than $75,000 at controversy. Though the contracts between Noble and DCP are worth millions of dollars, we cannot base federal jurisdiction on potential future litigation involving the defendants.

Accordingly, we **REVERSE** the district court and dismiss for lack of jurisdiction.

# I. Background

### A. Factual Background

Noble owns and holds interests in certain oil and gas leases in Colorado. From these leases, Noble produces natural gas, associated natural gas liquids (NGLs), and condensed liquid hydrocarbons. Before the gas can be marketed, it must be processed to remove impurities and separate liquid hydrocarbons from natural gas steam. For processing, Noble sells its natural gas to DCP for these post-wellhead services. First, Noble delivers its natural gas to DCP's processing plant. After processing, DCP sells the gas and retains a share of the sale proceeds as compensation for its services before paying the rest of the balance to Noble. The terms of DCP and Noble's compensation relationship are set out under what they call percentage or proceeds (POP) agreements.

#### 1. The Holman Settlement

In 2003, certain recipients of gas-well royalties from Noble's leases filed a class action lawsuit in Colorado state court against Noble, claiming Noble was underpaying royalties (the *Holman* suit). Phelps, a business that for many years received royalties from Noble, was a member of this plaintiff class.

Four years later, the *Holman* suit was settled. The settlement agreement (Holman Settlement) included what the parties called a "Future Royalty Calculation Method," which became effective on January 1, 2008. Under this

methodology, Noble agreed to pay the *Holman* suit class members royalties on 100 percent of cash payments received by Noble from natural gas sales and NGLs and on 50 percent of the cash proceeds retained by a provider of post-wellhead services like DCP.

The settlement also required Noble to pay royalties on 50 percent of the value of any volumes of natural gas and NGLs retained by post-wellhead service providers, used up during production, or otherwise lost and unaccounted for. In this lawsuit, Phelps contends Noble has failed to comply with the terms of the Holman Settlement and has underpaid its royalty payments to class members.

*2. DCP Settlement*

In 2008, Noble commissioned an audit of DCP. After Noble drafted a report identifying several potential instances of underpayment, DCP objected to the findings and disputed the amount of the alleged underpayment, $34 million. Over a period of nine months, Noble and DCP continued to negotiate the audit report findings. Noble modified some of its claims based on new information provided by DCP. In March 2010, Noble and DCP entered into a settlement agreement (DCP Settlement). In the DCP Settlement, Noble and DCP modified the terms of their contracts to increase the revenue Noble would receive from DCP going forward. DCP also agreed to commit $17.5 million towards improving its own gas processing and transportation infrastructure for the primary benefit of

Noble. These improvements would increase DCP's capacity to process and transport natural gas from Noble's wells. Although Noble did not receive any direct payments from the settlement, it estimated the net present value of the contract modifications to be approximately $44 million. All royalty owners, including Phelps, were paid increased royalties under the renegotiated DCP compensation contracts as a result.

### B. Procedural Background

In August 2014, Phelps filed its class action in state court in Colorado, asserting two claims against Noble based on the DCP Settlement: (1) Noble breached the Holman Settlement by not paying royalties on claims identified in the DCP audit where DCP underpaid Noble; and (2) Noble breached the implied duty of good faith and fair dealing by settling with DCP rather than recovering a higher amount in underpayments.

Shortly after the case was filed, DCP removed it to federal court. Phelps asked the district court to remand to state court, arguing DCP had not satisfied the amount-in-controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a). The district court denied the motion to remand, stating that DCP's cost of compliance with Phelps's declaratory judgment claim would exceed $75,000. Phelps then sought a mandamus from this court, but the petition was denied.

During discovery, the district court bifurcated the issues of liability and class certification. The parties then moved for summary judgment on liability. The district court granted summary judgment for Noble and DCP, except for one breach of contract claim. For the breach of contract claim, the district court found two prerequisites to Noble's obligation to pay royalties under the Holman Settlement: (1) production of natural gas and/or NGLs from the relevant wells; and (2) return of sales proceeds for that gas from DCP. Because the second prerequisite required that Noble receive actual payments from DCP, the court rejected Phelps's claims for royalties based on the amount that Noble allegedly should have received from underpayments claimed in the DCP audit. The court also rejected Phelps's claim for royalties based on the value of the gas retained by DCP through sale proceeds, under the 50 percent royalty obligation. But the court found that Phelps may be entitled to a royalty payment from Noble based on DCP's promise to invest $17.5 million in infrastructure—so long as the promise provided any value to Noble beyond increased production that would already benefit Phelps through royalty payments.

For the implied duty of good faith and fair dealing claim, the court found that Phelps lacked any evidence that Noble exercised its discretion under the Holman Settlement in bad faith.

The court allowed further discovery on Phelps's one remaining breach-of-contract claim regarding DCP's $17.5 million infrastructure investment. In September 2019, the district court entered final judgment and dismissed the remaining claim, finding that Phelps had failed to show Noble received any benefit from the infrastructure investment separate from increased production and revenues.

## II. Analysis

Phelps argues that the district court's denial of its motion to remand for lack of subject-matter jurisdiction was incorrect. Phelps contends the maximum cost of compliance for DCP on Phelps's individual claim would be limited to the amount of money DCP would be required to pay Noble to satisfy Phelps's individual claim for royalty underpayments, an amount less than $1,000.[1] DCP, in contrast, argues that a declaratory judgment in Phelps's favor could result in DCP being liable for the entire amount in the contracts between DCP and Noble, which could amount to millions of dollars.

---

[1] Phelps's royalty accounting expert calculated the damages sustained by Phelps to be $429.56 under the 100 percent obligation on the $17.5 million credit, $321.51 on the 50 percent obligation on the entire $35.4 million audit claim, and $162.76 on on the 50 percent obligation on the $17.9 million DCP retained from the DCP Settlement (the difference between the claimed underpayments in the audit and the eventual amount settled for in the agreement). App., Vol. XV, at 3419. DCP and Noble do not dispute that this would be the amount Phelps personally would receive in damages.

We agree with Phelps and dismiss for lack of subject-matter jurisdiction.

### A. *Legal Framework*

Subject-matter jurisdiction under 28 U.S.C. § 1332(a) requires, in addition to diversity of citizenship, an amount in controversy in excess of $75,000. A defendant "must affirmatively establish jurisdiction by proving jurisdictional facts" that make it "possible" an excess of $75,000 is "in play." *McPhail v. Deere & Co.*, 529 F.3d 947, 955 (10th Cir. 2008). Only if it is "legally certain" that the recovery or cost of complying with judgment will be "less than the jurisdictional floor may the case be dismissed." *Id.* (citing *Meridian Security Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006)). In an action seeking declaratory and injunctive relief, "the amount in controversy is measured by the value of the object of the litigation." *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006) (citation and internal quotation marks omitted).

In assessing whether the amount in controversy has been met, we apply the "either viewpoint" rule. Under this rule, we consider either the value of a judgment from the viewpoint of the plaintiff or the cost from the viewpoint of the defendant of injunctive and declaratory relief. *Justice v. Atchison, Topeka and Santa Fe Ry. Co.*, 927 F.2d 503, 505 (10th Cir. 1991). In other words, we look to "the pecuniary effect an adverse declaration will have on either party to the

-8-

lawsuit." *City of Moore v. Atchison, Topeka & Santa Fe Ry. Co.*, 699 F.2d 507, 509 (10th Cir. 1983).

But in multiple-plaintiff cases, such as this one, the "either viewpoint" rule does not override the well-established principle that each plaintiff or member of the class must individually satisfy the amount-in-controversy requirement. *See Lonnquist v. J.C. Penney Co.*, 421 F.2d 597, 599 (10th Cir. 1970). In class actions, "separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement." *Snyder v. Harris,* 394 U.S. 332, 335 (1969); *see also Lovell*, 466 F.3d at 897 ("Class members' claims may be aggregated to meet the amount in controversy requirement only when they unite to enforce a single title or right in which they have a common and undivided interest.") (internal quotations omitted); 14 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3725.3 (4th ed. 2020) ("By contrast, the rule has long been that separate and distinct claims of multiple plaintiffs cannot be aggregated to satisfy the amount-in-controversy requirement.").

### B.  *Application*

Phelps has put forth undisputed evidence that the maximum dollar amount it could recover, exclusive of interest, even if it prevailed on all of its claims against Noble and DCP, is less than $1,000. It is "legally certain" that a

declaratory judgment entered as to Phelps would not result in more than $75,000 at controversy in this case. *McPhail*, 529 F.3d at 955. Accordingly, the amount-in-controversy requirement cannot be met through Phelps's claim alone.

DCP does not resist this conclusion but instead argues that more than $75,000 is at issue because of the *possibility* that Noble could offensively deploy, by cross-claim or in future litigation, Phelps's declaratory judgment victory to hold DCP liable to the entire amount of underpayments owed to Noble. In this scenario, DCP contends it would be collaterally estopped from relitigating the issue of underpayment in the event of Phelps's success in this litigation.

But Noble has made no cross-claim, nor has it shown any interest in bringing a separate lawsuit against DCP. This is fatal. Our precedents explain that the amount in controversy cannot be based on contingent, speculative, or collateral claims that could possibly occur as a result of the judgment. *See First Eng. Lutheran Church of Oklahoma City v. Evangelical Lutheran Synod of Kansas & Adjacent States*, 135 F.2d 701, 703 (10th Cir. 1943) (finding that the church's future charitable payments could not be used to determine the amount in controversy because it was "uncertain, contingent, and speculative"); *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) (finding the amount in controversy is "determined by the amount involved in the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect

-10-

of the judgment"); *Healy v. Ratta*, 292 U.S. 263, 267 (1934) (finding that any "collateral effect" of a judgment "upon other and distinct controversies, may not be considered in ascertaining whether the jurisdictional amount is involved, even though their decision turns on the same question of law"); 14 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §3702.5 (4th ed. 2020) ("A very important corollary to the measurement principle is that whatever the collateral effects a decree or judgment might have by virtue of stare decisis, collateral estoppel, or any other impact on the rights or interests of third parties, those consequences cannot be taken into account in calculating the amount in controversy.").

Other circuits have similarly found that the amount in controversy cannot be met by "conjecture" and speculation. *Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 543 (3d Cir. 1995) (finding that the court "will not ordinarily consider such speculative arguments in determining the amount in controversy"); *see also Kheel v. Port of New York Auth.*, 457 F.2d 46, 49 (2d Cir. 1972) ("[T]he jurisdictional test is applicable to that amount that flows directly and with a fair degree of probability from the litigation, not from collateral or speculative sources."); *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1268–69 (11th Cir. 2000) (finding benefits resulting "from an injunction . . . so uncertain"

that the court could not "reasonably determine whether the amount of money placed in controversy by the present suit exceeds $75,000").

It is true that Phelps's declaratory judgment claim implicates contracts that are potentially worth several million dollars. And a judgment in Phelps's favor could possibly invoke issue preclusion principles in other cases. But, as explained above, these consequences alone are insufficient to satisfy the amount-in-controversy requirement. Both either (1) require aggregation of separate and distinct claims, or (2) require speculation about the possibility of future, uncertain litigation that results in a judgment against DCP. But no evidence has been provided to support either of these theories. DCP does not dispute that separate and distinct claims of different plaintiffs cannot be aggregated to meet amount in controversy. Nor does our precedent support basing the jurisdictional minimum amount in controversy on the sheer possibility that Noble may use the declaratory judgment of the court as a sword against DCP in later litigation.

DCP points to *McPhail*, where we held a defendant may establish amount in controversy by "attaching a copy of the contract, valued at more than $75,000" or "introduc[ing] evidence, in the form of affidavits from the defendant's employees or experts about how much it would cost to satisfy the plaintiff's demands." 529 F.3d at 956. DCP included a declaration by its senior director of revenue accounting, attesting that DCP had paid Noble more than $113 million on the five

specific contracts related to the wells at issue in this case. The language in *McPhail*, however, specifically explains that the affidavits must demonstrate the amounts necessary to "satisfy the plaintiff's demands." *Id.* Here, the cost to satisfy Phelps's demands could not possibly be more than $75,000. Moreover, the example of "attaching a copy of the contract" was limited to where a "plaintiff seeks damages in an indeterminate amount." *Id.* Phelps is not seeking to hold DCP or Noble liable for the entire amount of the compensation agreements between DCP and Noble, but rather the limited amount of an individual royalty payment.

DCP insists that because it does not individually pay royalties to Phelps, the declaratory judgment would require DCP to change numerous business practices. It suggests that this fact calls into question the entire monetary amount of its contracts with Noble. Although Phelps's complaint does mention DCP's procedures, it remains within the context of practices that led to lost revenues—on which Phelps seeks the relief of "commensurate compensation," and includes no mention of any request for DCP to overhaul its established practices. App., Vol. I, at 95.

In its ruling, the district court acknowledged that Phelps was "not seeking more than $75,000 in damages for itself." *Id.* at 184. Instead, the court found "if plaintiff were to receive the declaratory relief for which it prays, DCP would be

-13-

liable to Noble" and "plaintiff may seek further relief." *Id.* Both phrases admit

that further action beyond the declaratory judgment is required. *Id.* We must

determine the amount in controversy with the facts that are before us, not on the

"uncertain, contingent, and speculative" costs of future litigation. *First Eng.*

*Lutheran*, 135 F.2d at 701.

In sum, it is legally certain that the jurisdictional facts do not establish a

sufficient amount in controversy to qualify for federal subject-matter jurisdiction

under § 1332(a).

## III. Conclusion

For the foregoing reasons, we **REVERSE** the district court's denial of

Phelps's motion to remand and dismiss for lack of jurisdiction. Because we lack

jurisdiction, we do not reach the merits of Phelps's remaining claims.