FILED
United States Court of Appeals
Tenth Circuit

August 30, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

INTERSTATE MEDICAL
LICENSURE COMPACT
COMMISSION,

      Plaintiff Counter Defendant -
Appellee,

v.                                                            No. 23-1291

WANDA BOWLING,

      Defendant Counterclaimant -
Appellant.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:20-CV-02942-CMA-NRN)**
_____

Elizabeth Bollendonk and Ashley Stephens, University of Colorado, Law
School Appellate Advocacy Practicum (Matthew Cushing, Counsel of
Record, and Leo Nguyen, with them on the briefs), Boulder, Colorado, for
Defendant Counterclaimant-Appellant.

Richard L. Masters, Masters, Mullins & Arrington, Louisville, Kentucky,
for Plaintiff Counter Defendant-Appellee.
_____

Before **BACHARACH**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This appeal arises from the aftermath of Ms. Wanda Bowling's contract with the Interstate Medical Licensure Compact Commission. When the contract ended, Ms. Bowling allegedly withheld the Commission's login information for three online accounts. The withholding of login information led the Commission to sue for breach of contract, and Ms. Bowling counterclaimed for libel and misclassification of her employment status.[1] The district court dismissed the counterclaim for misclassification of employment status and granted summary judgment to the Commission on all other claims.

Ms. Bowling appeals, raising six issues:

1.  **Subject-matter jurisdiction on the Commission's claims.** For diversity jurisdiction, the Commission needed to allege an amount in controversy exceeding $75,000. Did the Commission allege facts that could reasonably reflect damages exceeding $75,000? We answer *yes*.

2.  **Liability for breach of contract.** The contract stated that the Commission (a) owned "all intellectual property" and (b) was entitled to the return of all "deliverables undertaken in furtherance of [s]ervices" and "materials" that contain, reflect, incorporate, or are based on confidential information. After the contract ended, Ms. Bowling allegedly declined to give the Commission her login information for three accounts. Did the login information constitute *intellectual property*; *deliverables undertaken in furtherance of services*; or *materials that contain, reflect, incorporate, or are based on confidential information*? We conclude that the answer turns on a genuine dispute of material fact based on ambiguities in the contract.

---

[1] Ms. Bowling also counterclaimed for intentional infliction of emotional distress and wrongful termination. But these counterclaims are not at issue in the appeal.

2

3. **Damages for breach of contract.** After Ms. Bowling's contract ended, a vendor charged the Commission more than it had budgeted. Did the Commission establish as a matter of law that these charges had resulted from Ms. Bowling's alleged breach of contract? We answer *no*.

4. **Leave to amend.** Ms. Bowling moved for leave to amend her counterclaim for misclassification of employment status, and the district court denied leave based on timeliness. Did the district court abuse its discretion in declining to find good cause for the delay? We answer *no*.

5. **Sua sponte award of summary judgment.** Ms. Bowling challenges the grant of summary judgment on her counterclaim for libel. The district court had granted summary judgment based on an affirmative defense of qualified privilege. But the Commission hadn't sought summary judgment based on a qualified privilege. Did the district court err by failing to give Ms. Bowling notice and an opportunity to respond? We answer *yes*.

6. **Substantial truth.** *Substantial truth* is an absolute defense to libel. In light of this defense, we must determine whether the Commission's alleged statements were substantially true. We answer *yes*.

## Background

### I. Ms. Bowling allegedly fails to return login information after her contract ended.

The Interstate Medical Licensure Compact Commission is an interstate agency that administers a process for states to issue medical licenses. The Commission and Ms. Bowling entered a series of contracts. The last contract triggered this appeal.

Under that contract, Ms. Bowling managed the Commission's functions for information technology. The contract ended in June 2020. When the contract ended, the Commission asked Ms. Bowling to

- furnish her login information for accounts with *PayPal*, *G Suite*, and *GoDaddy* and

- certify that she had erased all her confidential information.

Ms. Bowling allegedly declined these requests.

## II.    The Commission and Ms. Bowling sue, and the district court doesn't allow amendment of the counterclaim for misclassification.

The Commission sued Ms. Bowling for breach of contract, alleging that she had failed to

- furnish her login information and

- certify in writing that she had erased all the confidential information.

Ms. Bowling then counterclaimed for libel and misclassification of her employment status.

Ms. Bowling also moved to dismiss the Commission's complaint, arguing that the district court lacked subject-matter jurisdiction. The Commission objected and moved to dismiss Ms. Bowling's counterclaims. The district court

- denied Ms. Bowling's motion to dismiss and

4

- granted the Commission's motion to dismiss the counterclaim for misclassification.[2]

Ms. Bowling moved for leave to amend the counterclaim for misclassification. But the district court denied this motion, reasoning that Ms. Bowling had waited too long without a good reason.

### III. The Commission obtains summary judgment on the remaining claims.

The Commission moved for summary judgment on its contract claim and Ms. Bowling's counterclaim for libel. The district court granted the Commission's motion. On the Commission's contract claim, the court reasoned that

- Ms. Bowling's login information had constituted *intellectual property*, *deliverables undertaken in furtherance of services*, or *materials* involving confidential information,

- Ms. Bowling had breached the contract by failing to certify erasure of all confidential information from her computers, and

- the Commission had incurred damages of $956.67.

On the counterclaim for libel, the district court rejected liability based on a qualified privilege. While discussing this privilege, the court said that the Commission's statements had been substantially true.

---

[2]    These rulings left Ms. Bowling's counterclaim for libel.

**Discussion**

I.    **The district court had subject-matter jurisdiction over the Commission's claims.**

Ms. Bowling contests subject-matter jurisdiction, arguing that the Commission failed to allege the amount in controversy needed for diversity jurisdiction (over $75,000). *See* 28 U.S.C. § 1332(a).[3] But the Commission did allege damages exceeding $75,000. The Commission ultimately recovered less, but the complaint had included factual allegations that could have generated more than $75,000 in damages. So we affirm the district court's finding of diversity jurisdiction.

A.    **The Commission adequately alleged facts supporting the amount in controversy.**

The district court concluded that the Commission had adequately pleaded diversity jurisdiction. For the ultimate determination of subject-matter jurisdiction, we conduct de novo review; for the court's jurisdictional findings of fact, we apply the clear-error standard. *Wells Fargo Bank, N.A. v. Mesh Suture, Inc.*, 31 F.4th 1300, 1306 (10th Cir. 2022).

In its complaint, the Commission alleged that it

---

[3]    Ms. Bowling adds in a footnote that the complaint didn't identify the Commission's state of citizenship. But Ms. Bowling appears to acknowledge diversity of citizenship and confines her jurisdictional challenge to the amount in controversy.

> ha[d] incurred monetary damages, both previously and prospectively, including but not limited to, other costs and expenses to compensate for Plaintif[f]'s recovery of its property as well as damages for indemnity against potential violations of privacy and related claims to third parties and attorneys' fees and costs required by the above referenced contract. Said damages [were] in excess of $75,000.

R. vol. 1, at 17–18.

The claimant must allege facts showing damages bearing a reasonable relation to the jurisdictional amount. *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1183 (10th Cir. 2000). These allegations need not be specific or technical. *Id.*

The Commission alleged four kinds of damages that could reasonably exceed $75,000:

1.   costs and expenses to compensate for recovering property,

2.   indemnification for potential violations of privacy,

3.   related liabilities to third parties, and

4.   attorneys' fees and costs.

The Commission provided greater detail in a proposed scheduling order. *See McPhail v. Deere*, 529 F.3d 947, 956 (10th Cir. 2008) ("[D]ocuments that demonstrate plaintiff's own estimation of its claim are a proper means of supporting the allegations [to show the amount in controversy].").[4]

---

[4]   The Commission proposed a scheduling order, which listed eight items totaling $107,103 in damages:

The amount asserted in the complaint generally controls for subject-matter jurisdiction. *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1171 (10th Cir. 2011); *see McPhail*, 529 F.3d at 953 ("[A]ll the plaintiff needs to do is allege an amount in excess of $75,000 and he will get his way."); *see also* pp. 9–10, below. As a result, we rejected a similar jurisdictional challenge in *McPhail v. Deere & Co.*, 529 F.3d 947 (10th Cir. 2008). There we found jurisdiction based on allegations of severe bodily injuries and wrongful death. *Id.* at 957.[5]

---

1.    Purchase of new domain: $2,695

2.    Additional system security scans: $5,000

3.    DocuSign Additional Capacity: $17,388

4.    Increased Computer Services Support: $47,740

5.    Increased CRM Project Costs: $10,375

6.    Increased Computer Service Support: $11,865

7.    Increased Computer Service Support: $8,040

8.    Additional Commission staff work to develop an alternative system: $4,000

[5]    We recognized in *McPhail* that the complaint hadn't facially supported diversity jurisdiction. 529 F.3d at 957. But we noted that we could consider material beyond the complaint. *Id.* For example, we considered a statement by counsel for the party opposing jurisdiction, which acknowledged that the amount in controversy "very well may" exceed $75,000. *Id.* We concluded that this acknowledgment was enough to satisfy the jurisdictional threshold. *Id.*

Even when the complaint refers to damages below the jurisdictional threshold, dismissal may be premature. For example, we concluded in *Mocek v. City of Albuquerque* that dismissal would be premature even though the plaintiff had alleged economic damages of only $35,000. 813 F.3d 912, 934–35 (10th Cir. 2015). Though this amount fell below the jurisdictional threshold, we noted that

- "a complaint need not allege a specific sum in order to assert diversity jurisdiction" and

- the complaint had included allegations of economic loss and emotional distress.

*Id.* at 934–35. From these allegations, we concluded that dismissal would be premature. *Id.* at 935.

The same is true here, for the Commission alleged

- costs to recover property, indemnity, attorney's fees, and expenses to satisfy third-party claims and

- impediments to the continued processing of medical licenses.

This combination of allegations could support damages exceeding $75,000. So the Commission adequately alleged the amount in controversy.

## B.    The evidence didn't cap the damages at $75,000.

Ms. Bowling also argues that the Commission failed to present evidence supporting recovery of more than $75,000.

For this argument, Ms. Bowling needed to show a legal certainty that the Commission couldn't recover more than $75,000. *See Watson v.*

9

*Blankinship*, 20 F.3d 383, 386 (10th Cir. 1994); *see also Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1183 (10th Cir. 2000) ("[U]nless the law provides otherwise, the amount claimed by the plaintiff controls if the claim is apparently made in good faith."). But jurisdiction would arise in the absence of a legal certainty that the award would be limited to $75,000 or less. *Woodmen of World Life Ins. Society v. Manganaro*, 342 F.3d 1213, 1216 (10th Cir. 2003).

The standard of legal certainty is "very strict." *Id.* Given the strictness of the standard, we indulge a strong presumption favoring the plaintiff's allegations of the amount in controversy. *Id.*

Generally, a court can dismiss the complaint only when

- a contract or law limits the possible recovery or

- federal jurisdiction is obviously abused.

*Id.* at 1217. But Ms. Bowling does not point to

- a contract or law limiting the Commission's recovery or

- an obvious abuse of federal jurisdiction.

In responding to Ms. Bowling's motion to dismiss, the Commission argued:

> [Ms. Bowling's] failure and refusal to turn over the information necessary to continue to operate the data system used to process thousands of applications for medical licenses under the provisions of the interstate medical licensure compact agreement or to certify the return or destruction of confidential information and related liability from third parties, including applicants for medical licensure has proximately resulted in monetary damages in excess of $75,000 . . . .

R. vol. 1, at 74–75. Given this argument, we can't disregard the possibility of an award exceeding $75,000.

Ms. Bowling points to *Gibson v. Jeffers*, 478 F.2d 216 (10th Cir. 1973). There we noted that it wasn't enough for the plaintiff to assert that the claim involved the jurisdictional minimum. *Id*. at 221. But we added that

- "the test to determine amount in controversy is not a sum ultimately found to be due, but the sum demanded in good faith" and

- dismissal is appropriate only when there's "a legal certainty that the claim is for less than the jurisdictional amount."

*Id*. at 220. Though Ms. Bowling downplays the amount that the Commission could recover, her arguments do not establish with certainty that the amount would have been capped at $75,000.

Ms. Bowling also relies on *Abdel-Aleem v. OPK Biotech LLC*, 665 F.3d 38 (1st Cir. 2012). But *Abdel-Aleem* is not precedential, and it reinforces the importance of the claimed amount when it's asserted in good faith. *Id*. at 41. And there is no evidence that the Commission acted in bad faith when alleging damages over $75,000.

Moreover, *Abdel-Aleem* is factually distinguishable. There the plaintiff

- failed to state *any* amount in controversy, alleging only that the dispute exceeded the statutory minimum, and

11

- alleged the loss of a job without identifying the job or describing the circumstances.

*Id.* at 42. In contrast, the Commission stated the amount in dispute and provided an explanation. So *Abdel-Aleem* does not cast doubt on the adequacy of the amount in controversy.

Because Ms. Bowling failed to show with legal certainty that the amount in controversy was too low, we uphold the district court's finding of subject-matter jurisdiction.

## II. The district court erred in granting summary judgment to the Commission on its contract claim.

Given the existence of subject-matter jurisdiction, we address the Commission's contract claim. This claim has four elements under Colorado law[6]:

1. the existence of a contract,

2. the performance by the plaintiff or a justification for nonperformance,

3. the defendant's failure to perform a contractual obligation, and

4. the existence of damages.

*W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

---

[6] The parties assume that Colorado law applies, so we make the same assumption. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

12

On the third and fourth elements, the district court granted summary judgment to the Commission, concluding that

- Ms. Bowling had breached the contract and

- the damages had totaled $956.67.

We conclude that

- the contract was ambiguous on whether it covered the login information and

- the Commission didn't justify summary judgment on the amount of damages.

## A. The contract was ambiguous on Ms. Bowling's duty to return login information.

The threshold issues are

- whether the contract covered the login information and

- whether Ms. Bowling needed to return that information to the Commission.

For these issues, we conduct de novo review because interpretation of the contract turns on the language rather than extrinsic evidence. *See Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

The contract addressed ownership or the Commission's right to return of

- "intellectual property,"

- "deliverables undertaken in furtherance of [s]ervices," and

- "materials . . . containing, reflecting, incorporating, or based on . . . [c]onfidential [i]nformation."

13

R. vol. 1, at 41–42. But did the login information constitute (1) *intellectual property*, (2) *deliverables undertaken in furtherance of services*, or (3) *materials containing, reflecting, incorporating, or based on confidential information?*

### 1.  We must assess ambiguity based on the contractual language.

Under Colorado law, we examine the contractual terms and determine the parties' mutual intent. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (applying Colorado law). Unless evidence suggests an intent to stray from the contract's plain meaning, we focus on the plain meaning of contract terms. *Id.*

Ambiguity of a contract entails a question of law. *Anderson v. Eby*, 998 F.2d 858, 861 (10th Cir. 1993). A contract is ambiguous "if it is fairly susceptible to more than one interpretation." *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005). But disagreement alone doesn't trigger an ambiguity. *Id.*

### 2.  The contract is ambiguous on Ms. Bowling's duty to return the login information as *intellectual property*.

The contract stated:

All intellectual property and related materials . . . including any related work in progress that is developed or produced under this Agreement, will be the sole property of the [Commission]. The use of the Intellectual Property by the [Commission] will not be restricted in any manner.

14

R. vol. 1, at 41. The Commission and the district court interpret this language to cover login information; Ms. Bowling interprets the term *intellectual property* to exclude login information. Both interpretations are plausible.[7]

### a.　The contract is ambiguous on whether the login information constitutes *intellectual property*.

The Commission argues that Ms. Bowling admitted an obligation to provide the login information. But the Commission overstates Ms. Bowling's admissions. She admitted that

- the Commission had owned all *intellectual property* and *related materials*,

- the Commission's use of its intellectual property would not be restricted in any manner, and

- the Commission had requested return of the login information for three accounts.

*Id.* at 461–62. But in Ms. Bowling's responses to requests for admission, she denied that the login information constituted *intellectual property*. *Id.* at 462.

---

[7]　The district court interpreted the contract as unambiguously encompassing the login information, and the Commission agreed with this interpretation. In oral argument, Ms. Bowling characterized her interpretation as unambiguously excluding the login information. So no one has regarded the contract as ambiguous. But we can regard a contract as ambiguous even when both parties regard their own interpretations as unambiguously correct. *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022).

The Commission also points to the district court's interpretation of the contract. The district court understood the term *intellectual property* as a broad reference to "various types of creations of the mind." R. vol. 2, at 572. With this understanding, the court concluded that the login information constituted *intellectual property* under the contract.

Ms. Bowling challenges this conclusion, arguing that

- we must interpret *intellectual property* according to its ordinary meaning and

- the ordinary meaning precludes login information.

Colorado law permits consideration of recognized dictionaries to discern the ordinary meaning of contract terms. *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991); *see also McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1145 (10th Cir. 2023) (noting that under Colorado law, we may consider definitions in a recognized dictionary to determine the ordinary meaning of contract terms).

Ms. Bowling relies on two dictionary definitions of *intellectual property*:

1. "[a] commercially valuable product of the human intellect, in a concrete or abstract form, such as a copyrightable work, a protectable trademark, a patentable invention, or a trade secret"

2. "property that results from original creative thought, [such] as patents, copyright material, and trademarks"

16

*Intellectual Property*, Black's Law Dictionary 963 (11th ed. 2019); *Intellectual Property*, Webster's Encyclopedic Unabridged Dictionary of the English Language 990 (2001). Based on these dictionary definitions, Ms. Bowling argues that the term *intellectual property* doesn't include login information because it

- lacked independent economic value,

- wasn't registered, and

- involved a form of identification rather than creative expression.

Both sides present plausible interpretations. On the one hand, login information does involve a mental creation, which could trigger the district court's broad definition of *intellectual property*. In addition, the login information is needed for the Commission to access account records, which could constitute *intellectual property*. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360 (1991) (stating that compilations of facts or preexisting data can be copyrighted to the extent that the work features an original selection, coordination, or arrangement).

On the other hand, the Commission relies on the login information itself rather than the account records. The login information serves as identifying information, like a birthdate or Social Security number, and few people would regard a birthdate or Social Security number as

17

*intellectual property*. So the contract is ambiguous on whether the login

information constituted *intellectual property*.

> **b.      If the login information had constituted *intellectual property*, Ms. Bowling would have needed to return it.**

Ms. Bowling argues that she wouldn't need to return the login

information even if it had constituted *intellectual property*. But two factors

support a contrary interpretation of the contract:

1.      The Commission owned the *intellectual property*.

2.      The contract prohibited restrictions on the Commission's use of its intellectual property.

First, Ms. Bowling admitted that the contract rendered the

Commission the sole owner of *intellectual property*, and that ownership

entitled the Commission to return of its property.

Second, the contract prevented any restrictions on the Commission's

*use* of its *intellectual property*, and the Commission needed the login

information in order to use the account information. For both reasons,

Ms. Bowling would have had a contractual duty to return the login

information if it had constituted *intellectual property*.

Ms. Bowling insists that she owned the login information based on

three facts:

1.      She had created the accounts before the Commission started.

2.      She had provided guarantees on those accounts.

3.      She had linked these accounts to her personal information.

18

But the contract stated that the Commission owned all the *intellectual property*. So even if Ms. Bowling had originated the accounts, she would have needed to return the login information if it had constituted *intellectual property*.

### 3. The contract is ambiguous on whether the login information constitutes a *deliverable undertaken in furtherance of services* or *material* involving *confidential information*.

The district court ruled in the alternative that the login information constituted (1) *deliverables undertaken in furtherance of services* or (2) *materials containing, reflecting, incorporating, or based on confidential information*. For this ruling, the court relied on its reading of the contractual language and evidence involving best practices in the industry.

The district court based this reading on a plausible interpretation of the contract. The court concluded that

- Ms. Bowling had created the login information to facilitate the Commission's use of software platforms and

- the administrative rights and passwords had constituted *deliverables undertaken in furtherance of services*.

But Ms. Bowling's contrary interpretation is also plausible.

The contract stated:

Upon expiration or termination of this Agreement for any reason . . . [Ms. Bowling] shall within 5 calendar days . . . deliver to the [Commission] all deliverables *undertaken in furtherance of Services* (whether complete or incomplete) and all hardware,

19

software, tools, equipment, or other materials provided for [Ms. Bowling's] use by the [Commission]; deliver to the [Commission] all tangible documents and materials (and any copies) containing, reflecting, incorporating, or based on the Confidential Information.

R. vol. 1, at 42 (emphasis added).

Ms. Bowling argues that the login information is not a covered *deliverable* because "it was not created with the intent of being provided *as a product of her work*." Appellant's Opening Br. at 39 (emphasis added). To support this argument, Ms. Bowling points to evidence that she created the accounts with her personal data before entering into the contract with the Commission. *See id.* (citing Supp. R. vol. 1, at 112) (email confirmation for G Suite account sent to personal email roughly 2½ years before Ms. Bowling entered the contract). If that evidence is credited, the factfinder would need to determine whether Ms. Bowling had "undertaken" the login information "in furtherance of [her] [s]ervices" for the Commission. R. vol. 1, at 42.

The contract clause includes three content terms:

1. *Undertaken*

2. *In furtherance*

3. *Services*

The term *Services* is defined in the contract as the services that Ms. Bowling is "hereby" engaged to provide. *Id.* at 39; *see* p. 21, below. The other two content terms (*undertaken* and *in furtherance*) are

undefined; so we construe them "in accordance with their ordinary or natural meaning[s]." *United States v. Barajas-Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999). To discern the ordinary or natural meanings, we can consult dictionaries. *United States v. Roberts*, 88 F.3d 872, 877 (10th Cir. 1996).

The term *undertake* means "[t]o take on an obligation or task." *Undertake*, Black's Law Dictionary (12th ed. 2024). And the term *furtherance* refers to "[t]he act or process of facilitating the progress of something or of making it likely to occur; promotion or advancement." *Furtherance*, Black's Law Dictionary (12th ed. 2024). The *promotion* or *advancement* had to involve *Services*, defined under the contract as the services that Ms. Bowling "hereby" agreed to perform. R. vol. 1, at 39; *see* p. 20, above. Given these definitions, the contract created two plausible interpretations:

1.    The contract covered *deliverables* only if Ms. Bowling had created them after she agreed to perform services under the contract.

2.    The contract covered *deliverables* if Ms. Bowling had maintained them while performing services under the contract.

The evidence created a reasonable inference that Ms. Bowling had created the login information before she agreed to perform services for the Commission. The contract, "which is at the center of this case," was signed in April 2019. Appellee's Resp. Br. at 8 (citing R. vol. 1, at 460–64).

21

Ms. Bowling stated in a declaration that she had opened the G-Suite and PayPal accounts in 2016, before the Commission had even opened for business. R. vol. 2, at 190, 219.

This declaration is supported by an acknowledgment and additional evidence. For example, the Commission acknowledged that Ms. Bowling had opened the accounts. *Id.* at 271–72. And evidence showed reimbursements to Ms. Bowling for opening the accounts before she had signed the contract underlying the Commission's claim. *Id.* at 270. Given the Commission's acknowledgment and related evidence, a factfinder could reasonably infer that Ms. Bowling had created the login information before *undertaking* any obligations under the 2019 contract with the Commission. A genuine dispute of fact thus exists on whether the login information had been *undertaken in furtherance of services.*

Granted, one could argue that Ms. Bowling had created or maintained the login information in furtherance of her services. But the Commission hasn't made that argument. In fact, the Commission presents no argument for why the login information was a *deliverable undertaken in furtherance of services*. And we will not create arguments for the Commission that it has not made. *Cummings v. Dean*, 913 F.3d 1227, 1236 (10th Cir. 2019).

Ms. Bowling also argues that login information doesn't constitute *materials containing, reflecting, incorporating, or based on confidential information*. This interpretation is plausible because the login information

22

might not contain, reflect, or incorporate the Commission's confidential information. The login information allowed a user to access the accounts, which might contain confidential information. But the issue involves the login information itself rather than the content of the accounts.

The contract was thus ambiguous on whether the login information constituted a (1) *deliverable undertaken in furtherance of services* or (2) *material containing, reflecting, incorporating, or based on confidential information*.[8]

**4.    The contract's ambiguity prevented summary judgment.**

In these respects, classification of the login information is ambiguous; and this ambiguity required the district court to deny summary judgment, leaving interpretation to the factfinder. *See Palipchak v. Kent Const. Co.*, 554 P.2d 718, 719 (Colo. App. 1976) (stating that the trial court should have declined summary judgment after characterizing the contract terms as ambiguous); *see also Atl. Richfield Co. v. Farm Credit*

---

[8]    Ms. Bowling argues that she wouldn't have needed to return the login information even if it had otherwise fallen under the contract. For this argument, Ms. Bowling insists that she owned the login information. But the contract expressly required Ms. Bowling to "deliver"

- "deliverables undertaken in furtherance of [s]ervices" and

- "materials . . . containing, reflecting, incorporating, or based on the [c]onfidential [i]nformation."

R. vol. 1, at 42.

23

*Bank of Wichita*, 226 F.3d 1138, 1153 (10th Cir. 2000) (applying Colorado law to reverse the grant of summary judgment because the contract had been ambiguous); *Anderson v. Eby*, 998 F.2d 858, 866 (10th Cir. 1993) (concluding that Colorado law requires denial of summary judgment when the contract is ambiguous).

Granted, the district court pointed to extrinsic evidence supporting the Commission's interpretation of the contract. For example, Ms. Bowling admitted that "best practices" in the industry included return of relevant records, notes, documents, and other items that a worker had used. And the Commission presented evidence showing that Ms. Bowling had been the "Super Administrator" for the Commission's data system. But extrinsic evidence doesn't prevent a fact-question when the contract is ambiguous:

> While Plaintiff may present extrinsic evidence to the trier of fact in support of its resolution of the ambiguity, it is under no obligation to do so. Rather, for Defendants to prevail on summary judgment, it is incumbent on them to demonstrate to the court that there is no genuine issue of material fact. Defendants can only do so by showing, as a matter of law, that the [contract] unambiguously supports their position.

*Anderson*, 998 F.2d at 866 (applying Colorado law).[9]

---

[9]    Ms. Bowling suggests in footnotes that she satisfied any contractual duty to allow the Commission to assume control of the three accounts:

1.    *G Suite*

2.    *PayPal*

3.    *GoDaddy*

**B.    A genuine dispute of material fact exists on whether Ms. Bowling caused the Commission's damages.**

The district court ruled as a matter of law that Ms. Bowling had caused damages totaling $956.67. The court based this amount on a vendor's invoice, which showed costs exceeding the Commission's budget by $956.67.[10] In our view, the Commission didn't establish as a matter of law that the extra costs had resulted from Ms. Bowling's purported breaches.

---

For this suggestion, Ms. Bowling says that she explained to the Commission that

- it could continue using the *G Suite* account,

- the Commission was no longer using the *PayPal* account, and

- the Commission had bought the domain name for the *GoDaddy* account.

But Ms. Bowling does not present a distinct argument that she satisfied a contractual duty to return the login information. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) (concluding that issues raised in a footnote were waived through a failure to develop them as a distinct argument).

[10]    The Commission claimed damages arising from alleged increases in expenses to outside vendors. For this claim, the Commission relied on two invoices sent months after the termination of Ms. Bowling's contract. The district court

- zeroed in on the first invoice, which showed costs exceeding the Commission's budgeted amount, and

- used these costs to calculate the damages as $956.67.

25

The contract placed responsibility on Ms. Bowling "for any and all damages resulting from the unauthorized use of the Intellectual Property." R. vol. 1, at 41. But Ms. Bowling argues that the Commission failed to show

- that the $956.67 had stemmed from Ms. Bowling's failure to return login information or

- that any damages had resulted from Ms. Bowling's failure to certify erasure of confidential information.

We agree with Ms. Bowling. In calculating damages, the district court relied on an invoice showing the amount paid to an outside vendor. But the Commission didn't tie the extra costs to Ms. Bowling's failure to provide the login information.

The invoice attributed the extra costs to "Launch iStarsII," "Migration Assistance/New domain," and "Homepage map/updates." R. vol. 2, at 164. But none of the evidence tied Ms. Bowling's alleged contractual breach to the costs for "Launch iStarsII" or "Homepage map/updates." So a genuine dispute of material fact existed on the amount of extra costs attributable to Ms. Bowling's alleged breach.

The Commission also points out that Ms. Bowling breached the contract by failing to certify that she had erased all confidential

26

information.[11] But the Commission didn't show any damages from that breach.

The factfinder may ultimately find a separate breach from the failure to furnish the login information. But a genuine dispute of material fact exists on whether this potential breach would have caused any damages to the Commission.

### III.    The district court acted within its discretion when denying leave to Ms. Bowling to amend her counterclaim for misclassification.

Ms. Bowling argues that she should have had a chance to amend the counterclaim for misclassifying her employment status.

Ms. Bowling wanted to (1) add legal support on her counterclaim for misclassification and (2) add a claim for abuse of process. But Ms. Bowling had a problem with timeliness: Motions to amend had been due in March 2022, and she waited until September 2022 to seek leave to amend.[12] The district court denied the motion in part on the grounds that Ms. Bowling had waited too long and had failed to show good cause.

---

[11]    The contract required Ms. Bowling to erase all confidential information from her computers and certify the erasure. But she admittedly failed to provide this certification.

[12]    Ms. Bowling argues that mere delay isn't enough to prevent a pro se litigant from amending a pleading. For this argument, Ms. Bowling relies on our statement that "lateness does not of itself justify the denial of the amendment." Appellant's Opening Br. at 52 (citing *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 751 (10th Cir. 1975)). But she takes this quote out of context. We were addressing whether the trial court had abused its discretion in *granting* a party's motion to amend. *R.E.B.*, 525 F.2d at 751–

We review this ruling for an abuse of discretion. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). The district court ordinarily bears discretion to deny amendment on the ground that it is late. *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1315 (10th Cir. 2005); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365–66 (10th Cir. 1993). A movant seeking amendment after the deadline must show good cause for the delay. *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240–41 (10th Cir. 2014). And we held in *Gorsuch, Ltd, B.C. v. Wells Fargo National Bank Association* that good cause exists when the movant could not meet the deadline even when acting diligently. *Id.* at 1240–42.

Ms. Bowling concedes that she missed the deadline, but argues that she showed good cause. For this argument, she explains that during a status conference, the court set the same day as the deadline for motions to amend. But the court added that this deadline wouldn't prevent parties from moving later to amend; the movant would just need to satisfy the standard under *Gorsuch v. Wells Fargo*.

---

52. In that context, we recognized that a district court could permit an amendment even if the motion to amend had been late. *Id*. We address the opposite situation here (the *denial* of leave to amend). In this context, a court can deny leave to amend based on timeliness unless the movant shows good cause. *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240–41 (10th Cir. 2014); *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1315 (10th Cir. 2005).

The district court later denied leave to amend, finding that Ms. Bowling had failed to satisfy the *Gorsuch* standard in three respects:

1.    The alleged good cause involved discovery of these claims in July 2022 (after the Commission's initial disclosures). Based on these disclosures, Ms. Bowling argued that she needed to amend her misclassification claim by adding "adequate legal support regarding choice of law." But the Commission's initial disclosures didn't bear on the legal principles underlying the counterclaim for misclassification of employment status.

2.    In proposing to amend her counterclaim, Ms. Bowling didn't rely on anything that she had learned from the Commission's initial disclosures.

3.    The district court had dismissed Ms. Bowling's counterclaim for misclassification in July 2021, and she waited more than a year to seek leave to amend.

R. vol. 1, at 477. These findings fell within the district court's discretion.

Ms. Bowling insists that she showed good cause for the delay. Examples of good cause under *Gorsuch* include when

- a party learns new information through discovery or

- the underlying law has changed.

*Gorsuch*, 771 F.3d at 1240. Ms. Bowling does not provide a similar explanation of good cause. She instead argues that the court announced the deadline to amend pleadings on the same day as the deadline. But that argument doesn't explain why it took her six more months to seek leave to amend. *See Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1020 (10th Cir. 2018) (stating that good cause obligates the moving party to "provide an adequate explanation for any delay").

29

The district court had discretion to reject Ms. Bowling's explanation for her 6-month delay in moving for leave to amend. So the district court didn't abuse its discretion when denying Ms. Bowling's motion.

**IV.    The district court didn't commit reversible error in granting summary judgment to the Commission on Ms. Bowling's counterclaim for libel.**

Ms. Bowling argues that the district court shouldn't have relied on a qualified privilege when granting summary judgment to the Commission on the counterclaim for libel. For this argument, Ms. Bowling points out that the Commission hadn't sought summary judgment based on a qualified privilege. We agree with Ms. Bowling.

Apart from a qualified privilege, however, the alleged statements couldn't be libelous because they were substantially true. So the Commission was entitled to summary judgment on the counterclaim for libel.

**A.    A statement is defamatory if it is false and harms another person's reputation.**

Under Colorado law, *defamation* is a communication that damages someone through contempt or ridicule. *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994). A statement may be defamatory if it harms another person's reputation by

- lowering the person's estimation among the community or

- deterring people from associating with this person.

30

*Burns v. McGraw-Hill Broad. Co., Inc.*, 659 P.2d 1351, 1357 (Colo. 1983).

The statement constitutes *libel* when the defamation is in writing. *Keohane*,

882 P.2d at 1297 n.5.

Ms. Bowling alleged that the Commission had published defamatory

statements in emails, an internal memorandum, and board minutes. The

alleged statements were that

- Ms. Bowling had voluntarily left the Commission or voluntarily allowed her contract to expire by declining to respond to the Commission's deadline to extend her contract,

- the personnel committee had participated in the dismissal and had recommended staffing changes,

- the executive committee had voted to take legal action against Ms. Bowling, and

- Ms. Bowling had held intellectual property and failed to respond to requests to surrender her administrative rights.

The district court relied on a qualified privilege in concluding that no

genuine dispute of material fact existed.

**B.     Our review is de novo.**

We conduct de novo review over the district court's grant of

summary judgment. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir.

2020). We use the same standard applied by the district court: Viewing the

facts in the light most favorable to Ms. Bowling, we resolve all factual

disputes and reasonable inferences in her favor. *Cillo v. City of Greenwood

Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). We must affirm the district

31

court's grant of summary judgment in the absence of a genuine dispute of material fact if the movant was entitled to judgment as a matter of law. *Id.*

### C. The district court erred in relying on a qualified privilege without notice to Ms. Bowling.

The district court erred in sua sponte granting summary judgment based on a qualified privilege.

Qualified privilege is an affirmative defense under Colorado law. *Morley v. Post Printing & Publ'g Co.*, 268 P. 540, 543 (Colo. 1928). And a district court errs when it

- grants summary judgment by raising a defense sua sponte and

- fails to give notice and an opportunity for the nonmovant to respond.

*See Graham v. City of Okla. City*, 859 F.2d 142, 145 (10th Cir. 1988) (concluding that the district court erred in granting summary judgment on an issue raised sua sponte when the losing party lacked notice and an opportunity to respond); *see also Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 481–82 (10th Cir. 2023) (concluding that the district court erred in sua sponte invoking a defense of laches without providing notice and a reasonable time to respond).

The district court acknowledged that "[n]either party [had] briefed the issue" of a qualified privilege. R. vol. 2, at 586. But the district court

didn't supply notice to Ms. Bowling. Without notice and an opportunity for

Ms. Bowling to rebut a qualified privilege, the district court erred.[13]

> **D.     The Commission's allegedly libelous statements were substantially true.**

Despite that error, the alleged statements were substantially true. So

we affirm the grant of summary judgment on the libel claim.[14]

Under Colorado law, *substantial truth* constitutes an absolute defense

to defamation. *Gomba v. McLaughlin*, 504 P.2d 337, 338 (Colo. 1972); *see*

---

[13]     Ms. Bowling also argues in her opening brief that the Commission waived a qualified privilege by omitting it in the answer, the motion to dismiss, and the motion for summary judgment. We need not decide whether the Commission has waived the defense. We instead conclude only that the district court shouldn't have granted summary judgment based on a qualified privilege.

[14]     The district court relied on a qualified privilege, but also regarded the alleged statements as largely true. *Truth* could serve as its own defense or as a means of defeating a qualified privilege. *See Thompson v. Pub. Serv. Co. of Colo.*, 800 P.2d 1299, 1306 (Colo. 1990) (stating that a qualified privilege requires the plaintiff to show publication of the material with knowledge of the falsity or reckless disregard for the veracity); *Lindemoth v. Jefferson Cnty. Sch. Dist. R-1*, 765 P.2d 1057, 1058 (Colo. 1988) ("Substantial truth is an absolute defense to a defamation claim."). It's unclear whether the district court relied on *substantial truth* as a stand-alone defense or as a means of defeating the qualified privilege.

If the court had been addressing only the qualified privilege, we could still affirm the ruling on the alterative ground of *substantial truth*. The parties briefed the issue both in district court and on appeal, the availability of summary judgment involves a matter of law, and the parties had an opportunity to develop the summary-judgment record. *See I Dig Texas, LLC v. Creager*, 98 F.4th 998, 1009 (10th Cir. 2024) (stating that we could affirm on an alternative ground because the availability of summary judgment entails a matter of law and the parties had a chance to fully develop the record by presenting evidence on the truth or falsity of

33

p. 33 n.14, above. A defendant asserting substantial truth need not justify every word. *Gomba*, 504 P.2d at 339. It is enough if the "substance, the gist, the sting, of the matter is true." *Id.* The question is whether the statement produces a different effect on the reader than that the literal truth would have produced. *Id.*

The statements at issue are substantially true for four reasons.

First, Ms. Bowling did allow her contract to expire. The Commission's executive director had

- offered a two-month extension of the contract and

- asked Ms. Bowling to confirm acceptance of the offer.

Ms. Bowling didn't accept the Commission's offer. So it is substantially true that Ms. Bowling allowed her contract to expire.

Second, the Commission made a substantially true statement about the personnel committee's involvement because this committee had recommended changes in staffing. For example, a member of the personnel committee had told Ms. Bowling that the committee was making recommendations about the conversion of workers from status as independent contractors to employees.

---

advertisements); *see also Lawson v. Spirit AeroSystems, Inc.*, 61 F.4th 758, 764 (10th Cir. 2023) (identifying the factors bearing on discretion to affirm on alternative grounds).

34

Third, the Commission made a substantially true statement about the votes for legal action. The Commission said that the executive committee had voted to begin legal action against Ms. Bowling. There's no evidence of this vote. But the gist of this statement is substantially true, as evidenced by this appeal: The Commission *did* begin legal action against Ms. Bowling, whether by vote of the executive committee or another internal process.

Fourth, the Commission made a substantially true statement about Ms. Bowling's withholding of intellectual property. As noted above, a factfinder might reasonably conclude that the login information doesn't constitute *intellectual property*. *See* Discussion–Part II(A)(2)(a), above. But the statement might be *substantially true* even if the login information hadn't technically qualified as *intellectual property*. *See Bustos v. A&E Television Networks*, 646 F.3d 762, 762–64 (10th Cir. 2011) (Gorsuch, J.) (applying Colorado law). For example, suppose that

- the plaintiff helped a disliked gang and

- the defendant inaccurately says that the plaintiff was a *member* of that gang.

*Id.* at 762–63, 768–69. The statement is inaccurate, but the inaccuracy doesn't matter: The sting would have been the same if the defendant had called the plaintiff a *helper* rather than a *member*. *Id.* at 768–69. So we would regard the statement as substantially true despite the inaccuracy. *Id.*

35

The same is true here. The Commission said:

> Requests were made to Ms. Bowling to comply with the requirements of the Agreement to return the intellectual property and surrender administrative rights. As of the date of this memo, no response to the request to comply have been received.

R. vol. 1, at 39. In seeking summary judgment, the Commission argued that this statement was substantially true. Ms. Bowling responded in just one sentence, calling the statement *false* without any explanation.

On appeal, Ms. Bowling argues that the login information doesn't constitute *intellectual property*. As discussed above, the term *intellectual property* is ambiguous and a factfinder could reasonably find that this term doesn't encompass login information. *See* Discussion–Part II(A)(2)(a), above. But when we assess substantial truth, we focus on how someone would generally interpret a statement rather than its technical meaning. Restatement (Second) of Torts § 581A cmt. f (1977). So a statement can be substantially true even when it's ambiguous. *See Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn. App. 1996); *Clardy v. Cowles Pub. Co.*, 912 P.2d 1078, 1086 (Wash. App. 1996).

The Commission's statement appeared to link Ms. Bowling's possession of *intellectual property* to her failure to respond and surrender her administrative rights to the account information. *See* pp. 35–36, above. And in responding to the summary-judgment motion, Ms. Bowling didn't deny that she had failed to respond or to surrender her administrative

36

rights. Given the summary-judgment arguments and evidence, the Commission's statement would have stung equally without the characterization of login information as *intellectual property*. The statement was thus substantially true.

Because the four alleged statements are substantially true, the Commission was entitled to summary judgment on the libel claim despite the district court's error in raising a qualified privilege without notice to Ms. Bowling.

## Conclusion

The Commission adequately alleged facts reflecting over $75,000 in damages, and Ms. Bowling did not show to a legal certainty that the damages couldn't satisfy the jurisdictional minimum. So we affirm the district court's finding of subject-matter jurisdiction.

The contract is ambiguous on whether the login information constitutes

- *intellectual property*,

- *deliverables undertaken in furtherance of services*, or

- *materials containing, reflecting, incorporating, or based on confidential information*.

And the Commission did not show as a matter of law that Ms. Bowling had caused the vendor's extra charges. So we reverse the grant of summary judgment to the Commission on its contract claim.

37

The district court acted within its discretion when concluding

- that Ms. Bowling had waited too long to move for leave to amend her counterclaim for misclassification of employment status and

- that Ms. Bowling hadn't shown good cause for the delay.

So the district court did not abuse its discretion in denying the motion for leave to amend.

In ruling on Ms. Bowling's counterclaim for libel, the district court erred in sua sponte invoking the defense of qualified privilege without notice to Ms. Bowling. Despite this error, all of the statements at issue were substantially true; so we affirm the district court's grant of summary judgment on the counterclaim for libel.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

23-1291, *Interstate Medical Licensure Compact Commission v. Bowling*

**TYMKOVICH**, Circuit Judge, concurring in part and dissenting in part.

The Majority concludes the contract is ambiguous as to whether login information is a "deliverable" and so reverses and remands the district court's determination that Ms. Bowling breached. Maj. at 19–24. I disagree that "deliverable" is ambiguous and think login information is plainly a "deliverable" under the contract—meaning I would affirm.

Accordingly, I respectfully dissent as to parts (II)(A)(3) and (4).

## I. Breach of Contract

In Colorado, a contractual term is ambiguous only "if it is susceptible on its face to more than one reasonable interpretation." *Am. Fam. Mut. Ins. v. Hansen*, 375 P.3d 115, 120–21 (Colo. 2016) (citation omitted). "Absent such ambiguity, we will not look beyond the four corners of the agreement to determine the meaning intended by the parties." *Id.* at 121. "[E]xtrinsic evidence cannot create ambiguity; it is an aid to ascertaining the intent of the parties once an ambiguity is found." *Id.*

### A. Ms. Bowling's "Services"

The first step is determining what the contract required of Ms. Bowling. *Id.* at 121. The "Services Provided" section tells us: "The [Commission] hereby agrees to engage [Ms. Bowling] to provide the [Commission] with services ("Services") which include the oversight and management of the [Commission]'s Information Technology Functions." R. Vol. I at 39.

Manage the Commission's IT "functions" is precisely what Ms. Bowling did. As relevant here, she set up and oversaw the Commission's email services (via G Suite),

payment services (via PayPal), and Internet domains (via GoDaddy).  No one argues either "services" or "Information Technology Functions" is ambiguous or that Ms. Bowling's management of the accounts was extra-contractual.  And for good reason: these activities are plainly "services" for an IT professional.

### B. Termination Provision

But providing IT management services during the contract's term was not Ms. Bowling's only affirmative obligation.  "Upon expiration or termination", the contract required she "deliver to the" Commission "all deliverables undertaken in furtherance of [those] Services (whether complete or incomplete)".  R. Vol. I at 42.  I think providing access to the accounts after termination was a "deliverable" undertaken pursuant to Ms. Bowling's contractual "Services."

Login information provides account access, and "access" is "the crux of the lawsuit."  Aple. Br. at 24.  The fledgling Commission contracted with Ms. Bowling to manage its IT infrastructure.  And because one needs to access IT accounts to use them, I agree with the Commission that this case turns on access.  Ms. Bowling's "services" included managing the accounts at issue and adapting them to meet the Commission's business needs.  Indeed, in arguing the login information is *not* a deliverable, Ms. Bowling admits she "created" it "to enable the creation of deliverables," Aplt. Br. at 39, explicitly admitting that the accounts' themselves *were* deliverables.  To accept that she could withhold access is to accept that she could cripple the same systems she was contractually obligated to implement.  The situation is analogous to an artist who is contracted to paint a portrait and then delivers the portrait in a lockbox without the key.

2

Access is what matters. And that access can be "delivered"[1] in a conventional sense: as the Commission argues, Ms. Bowling could have "transfer[ed the] administrative rights and passwords for" the Commission's "technology accounts." Aple. Br. at 14. But Ms. Bowling chose not to transfer access; instead, she chose to hold it hostage. In my view, that is plainly a breach.

The Majority does not substantively dispute that withholding access is a breach, Maj. at 22, but instead faults the dissent for "creat[ing] arguments for the Commission that it has not made." *Id.* But the Commission has made the argument. Its brief refers to "access" three times—even calling it "the crux of the lawsuit." Aple. Br. at 17, 24. And in other places, it uses the terms "login information," "passwords," "administrative rights," "administrative control," or "accounts." *See, e.g.*, Aple. Br. at 14 ("Ms. Bowling breached her contract by failing to transfer *administrative rights* and *passwords* for IMLCC technology accounts") (emphasis added); *id.* at 16–17 ("the administrative rights/passwords of accounts established by Ms. Bowling through the course of her work with IMLCC constitute 'intellectual property' (and/or 'deliverables' or 'materials')"); *id.*

---

[1] Ms. Bowling defines "deliverables" as something "able to be delivered" or "provided, esp[ecially] as a product of a development process." Aplt. Br. at 39 (quoting New Oxford American Dictionary 459 (3d ed. 2010). "Deliver" means, among other things, "to send, provide, or make accessible to someone electronically." *Deliver*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/deliver (last visited Aug. 5, 2024). Login information can be sent, provided, or made accessible to someone electronically, so in my view it fits easily within Ms. Bowling's proffered definition of deliverable, meaning it is not ambiguous. Indeed, as the Majority recognizes, "no one"— neither the parties nor the district court—"has regarded the contract as ambiguous." Maj. at 15 n. 7. I agree with the parties and the district court: the contract is not ambiguous.

at 17 ("these *accounts* undoubtedly also constitute 'intellectual property' (and/or 'deliverables' or 'materials')") (emphasis added); *id.* at 20 ("the costs incurred to mitigate the failure of Defendant Bowling to return *administrative control* of the necessary IT accounts was $82,686.34."); *id.* at 24 ("Finally, the District Court concluded that 'Ms. Bowling has already conceded that IMLCC did not, in fact have *access* to the Accounts to which it demanded access, *which is the crux of the lawsuit*.") (emphasis added).

Potato pohtato.  Access is a necessary predicate to information's characterization as "*login* information" or a "password"—as it is to possessing "administrative control" or "rights" to "accounts."  Dissociating the access login information provides from its alpha numeric form is analytic legerdemain because "information" that does not permit "login" is not "*login* information"—just as a word that does not provide a "pass" is not a *pass*word.  At bottom, the Majority does not quibble that access to the accounts is a "deliverable."  And if that is true, then it inextricably follows login information (or passwords, or administrative control) are as well.[2]

As the Majority notes, a contract is ambiguous only "if it is fairly susceptible to more than one interpretation." *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005).  But when the only reasonable interpretation is plain from the term's ordinary meaning and the contractual context, a party cannot *create* ambiguity by offering extrinsic evidence to show a conflicting interpretation—as Ms.

---

[2] Even if none of this were true, "[w]e have long said that we may affirm on any basis supported by the record[.]" *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

4

Bowling does here with a myopic dictionary interpretation of "deliverable[s] undertaken in furtherance of services." *Hansen*, 375 P.3d at 121; Aplt. Br. at 39 (arguing the login information is not a deliverable because "it was not created with the intent of being provided as a product of her work."). Not only is a dictionary unnecessary to discern that provision's meaning here, but neither the contract nor the dictionary definitions suggest "deliverable" has a subjective intent component.

Read in proper context, the "deliverable[]" provision is not ambiguous. The Commission contracted with Ms. Bowling to manage, oversee, and implement its IT functions. Doing so required technology accounts—something Ms. Bowling provided. Using accounts requires accessing them. Accessing accounts requires login information. And login information can be delivered. It is irrelevant that Ms. Bowling created the accounts (and the login information) *before* contracting with the Commission, Maj. at 20, because she chose to configure them to and use them for the Commission's business *afterwards*—while "in furtherance" of her contractually obligated services. Put another way, Ms. Bowling managed the Commission's IT functions by adapting existing accounts to that end—accounts the Commission later reimbursed her for. Maj. at 22. Tellingly, nothing suggests Ms. Bowling was required to use her own accounts or couldn't have created new ones for that purpose. She should bear the consequences of that decision, not the Commission.

Ms. Bowling's argument atomizes the issue to shift focus away from what matters: she is an IT professional who withheld access to the functionality she was hired to implement. She chose to build the Commission's IT functionality on preexisting

5

accounts.  That choice did not come with a kill switch to be deployed if the Commission upset her.  In my view, the only plausible interpretation is the "contract covered" the login information as a "deliverable[]" because that information enables access to the accounts Ms. Bowling "maintained" "while performing services under the contract." Maj. at 21.  Ms. Bowling offers no contextually plausible alternative interpretation, so there is no ambiguity.

## II. Conclusion

Because I would hold "deliverables" is not ambiguous and that account access was unambiguously a "deliverable undertaken in furtherance of" Ms. Bowling's contractual "services," I would affirm that Ms. Bowling breached the contract by withholding access to the accounts she was hired to manage.

Accordingly, I respectfully dissent as to parts (II)(A)(3) and (4).